[No. 57291-7. En Banc. December 12, 1991.]

CELLULAR ENGINEERING, LTD., *Respondent*, v. DENNIS O'NEILL, *Appellant*.

18

*Sirianni & Youtz* and *Michael A. Small,* for appellant.

*Feinstein & Bull, Larry B. Feinstein,* and *Michael E. Morgan* and *Lane Powell Spears & Lubersky,* for respondent.

GUY, J. — The Federal Communications Commission (FCC) regulates the cellular telephone industry. In 1984, the FCC adopted a lottery system to determine, for each of numerous specified areas, who would receive the license to establish a cellular telephone system in that area. Winners of the lottery would be issued construction permits, and only after various permit requirements were fulfilled would the actual licenses be granted. Lottery entrants were required to complete an application containing detailed technical, geographical, demographic, and financial information. Because of the complexity of these applications, several application filing firms developed. These firms gathered the necessary information to prepare generic applications, then filed nearly identical applications for a number of investors. Typically, these firms also offered investors a range of post-filing services. The plaintiff, Cellular Engineering, Ltd. (Cellular), is one such application filing firm. The defendant, Dennis O'Neill, entered into an application purchase agreement with Cellular under which Cellular completed FCC lottery applications for O'Neill. The present dispute arose when O'Neill refused to pay fees Cellular claimed to be due. The primary issue here is whether Cellular's activities constitute the sale and offer for sale of securities under The Securities Act of Washington, RCW 21.20. We hold that they do. Those securities were not registered, in violation of RCW 21.20.140. Because Cellular's application purchase agreements with its customers were made in violation of the act's registration requirement, Cellular may not base any suit upon its agreement with O'Neill. Accordingly, Cellular's agreement with O'Neill is unenforceable.

## FACTS

Under the terms of Cellular's application purchase agreement, Cellular would complete and file a minimum of 10 lottery applications for each client at a charge of $50 per

application. If the applicant did not win a license in the lottery, no additional payments were due. If the applicant did win a license, then Cellular was entitled to certain contingent payments. For the first three "wins", the applicant was to pay Cellular $5,000 each. For each subsequent win, the applicant was to pay Cellular $10,000 each. These payments were due only as income was received from the system. In addition, the Cellular fee structure called for a "bonus payment" of $90,000 for each "full license" received. Finally, applicants could join together into "settlement groups" in an effort to increase their chances of winning. A person joining a settlement group agreed to share any license he or she won in the lottery for a particular market with others in the group who applied for the same market. Under FCC regulations, the person whose name was selected was required to maintain a majority interest in the group; minority owners could hold no more than a 0.99 percent interest. Cellular's contingent fees applied whether the applicant won a full or partial license interest.

When he first contacted Cellular, O'Neill had employed other application filing services for the cellular telephone lottery on two previous occasions. These previous efforts had resulted in O'Neill receiving partial interests in several licenses. Attracted by Cellular's contingent fee structure, O'Neill paid Cellular $5,000 for 100 applications. He subsequently joined several settlement groups after receiving promotional literature from Cellular encouraging him to do so. O'Neill eventually won partial interests in 23 cellular licenses and was the name selectee for Aguadilla, Puerto Rico. Since O'Neill was part of a settlement group for Aguadilla, he shared that market with the other members of the group.

Shortly after O'Neill learned that he had won minority interests in three markets, he received invoices from Cellular calling for payments of $5,000 for each interest. He refused to make the payments, maintaining that they were not yet due since the FCC had not yet issued the actual licenses. Through his attorney, O'Neill requested from Cel-

lular a more detailed explanation of the charges. Cellular did not respond to O'Neill's requests. In the meantime, O'Neill sold his majority interest in the Aguadilla cellular license for $1,114,000.

Cellular brought this action for payment under the terms of the application purchase agreement. O'Neill contended he was not liable to Cellular for two reasons. First, he maintained the payments were not yet due under the agreement. Second, he argued that the agreement was a contract for the sale of securities and, therefore, was unenforceable because Cellular had not complied with the registration requirements of The Securities Act of Washington. The trial court rejected O'Neill's arguments and granted Cellular's motion for summary judgment as to the contingent fees for all 23 interests O'Neill had won. After further factfinding, the court denied Cellular's claim to the $90,000 bonus payment. O'Neill appealed the court's summary judgment order. Cellular cross-appealed the order denying its claim for the bonus payment. The Court of Appeals certified the case to this court.

ANALYSIS

I

PROCEDURAL ISSUES

The primary issue in this case is whether Cellular's activities constitute the sale and offer for sale of securities. Before we can reach that issue, however, we must first address Cellular's contention that O'Neill's securities defense may not be considered because it was raised in an untimely fashion, and because it was not affirmatively pleaded as required by CR 8(c). We reject these arguments.

■ CR 8(c) requires that: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . illegality . . . and any other matter constituting an avoidance or affirmative defense." Although O'Neill did not plead the securities defense in his answer to Cellular's original complaint, he did raise it in response to Cellular's amended complaint. The CR 8(c) requirement is satisfied

when an affirmative defense is raised for the first time in response to an amended complaint. Therefore, O'Neill did not violate CR 8(c).

Cellular also argues that O'Neill's securities defense is untimely under CR 12, which allows a defendant 20 days in which to answer after service of the summons and complaint. We disagree. First, we note that since O'Neill did not raise the securities defense in his answer to Cellular's original complaint but in his answer to Cellular's amended complaint, the applicable rule is not CR 12, which sets forth the time period for responding to the *initial* summons and complaint, but CR 15(a), the rule specifying the time period for responding to an *amended* complaint. Under CR 15(a), "[a] party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders." Cellular's amended complaint was filed on January 18, 1989, and O'Neill's answer was not filed until June 7, 1989. O'Neill's response was therefore not within the applicable time period.

■ Under RCW 4.32.250, however, the trial court may, "on such terms as are just", permit a paper to be filed or served after the applicable time period for doing so has expired. Here, the trial court properly exercised its discretion in accepting O'Neill's tardy answer to Cellular's amended complaint. Doing so enabled the court to reach the merits of the case and did not prejudice Cellular. Cellular was not caught unprepared by the securities defense. On June 9, 1989, 2 days after O'Neill raised the securities issue, Cellular presented the court with a response memorandum that included a 7-page rebuttal. On June 12, 1989, Cellular filed an 18-page document entitled "Declaration of Anthony W. Djinis", which is devoted exclusively to the securities issue. Moreover, Cellular had encountered a securities defense in at least one other lawsuit in which it was trying to collect fees under an application purchase agreement, so it is unlikely that Cellular was wholly sur-

prised by O'Neill raising the issue. Under these circumstances, we find no error in the trial court's exercise of its discretion to accept O'Neill's tardy answer to Cellular's amended complaint. We wish to emphasize, however, that we do not approve of failure to file papers within the prescribed time periods, and that the trial court has discretion to reject untimely papers.

█ Finally, Cellular contends that O'Neill is time barred from raising the securities defense by RCW 21.20.430(4)(b), which provides: "No person may sue under this section more than three years after the contract of sale for any violation of the provisions of RCW 21.20.140 through 21.20.230". Cellular argues that O'Neill's defense is barred under this statute because the application purchase agreement was signed on February 17, 1986, whereas the defense was not asserted until June 7, 1989. Cellular misinterprets the statute. The time bar applies only to those who would *sue* more than 3 years after the contract of sale; it does not limit defenses. Since O'Neill is raising the securities issue as a defense, RCW 21.20.430(4)(b) does not apply.

## II
### THE SECURITIES DEFENSE
#### A. General Principles

█ The Securities Act of Washington, RCW 21.20, is remedial in nature, its primary purpose being to protect investors from speculative or fraudulent schemes of promoters. *State v. Philips*, 108 Wn.2d 627, 631, 741 P.2d 24 (1987); *McClellan v. Sundholm*, 89 Wn.2d 527, 533, 574 P.2d 371 (1978); *see generally* Comment, *Securities Fraud Under the Blue Sky of Washington*, 53 Wash. L. Rev. 279, 282 (1977-1978). We construe the act broadly in order to effectuate that purpose. *McClellan*, at 533; *see also Hoffer v. State*, 113 Wn.2d 148, 152, 776 P.2d 963 (1989); *Haberman v. WPPSS*, 109 Wn.2d 107, 126, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed*, 488 U.S. 805 (1988). The act is modeled after the Uniform Securities Act of 1956, which has been wholly or substantially enacted in the great

majority of states. *Haberman*, at 125; Uniform Securities Act, 7B U.L.A. 509 (1985). The Washington act explicitly provides that it

> shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation.

RCW 21.20.900. Therefore we interpret the act so as to achieve harmony between it, federal law, and the securities laws of those other states that have also modeled their law after the Uniform Securities Act. *Haberman*, at 125.

■ The central issue in the present case concerns the nature of a security. The act defines the term "security" to mean

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture . . ..

RCW 21.20.005(12). This definition mirrors the definitions of the Federal Securities Act of 1933, 15 U.S.C. § 77b (1988) and the Securities Exchange Act of 1934, 15 U.S.C. § 78c (1988). *Philips*, at 630. To determine the meaning of the term "security", we therefore look to federal law. *Philips*, at 630.

■ The United States Supreme Court has declared that the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 90 L. Ed. 1244, 66 S. Ct. 1100, 163 A.L.R. 1043 (1946). The Court has also stated that in determining whether a given transaction constitutes a "security" under the federal statutes, "form should be disregarded for substance and the emphasis

should be on economic reality." *Tcherepnin v. Knight*, 389
U.S. 332, 336, 19 L. Ed. 2d 564, 88 S. Ct. 548 (1967). This
accords with Congress's purpose in enacting the securities
laws, which was "to regulate *investments*, in whatever form
they are made and by whatever name they are called."
*Reves v. Ernst & Young*, 494 U.S. 56, 61, 108 L. Ed. 2d 47,
57, 110 S. Ct. 945 (1990).

## B. Investment Contract Analysis

■ O'Neill would have us declare that Cellular's applica-
tion purchase agreements fall into three of the categories of
securities listed in RCW 21.20.005(12). He argues that they
qualify as investment contracts, profit sharing agreements,
and investments of money in the risk capital of a venture.
We agree that Cellular's investment scheme involves securi-
ties, but we adopt an approach that is broader in one way
and more restricted in another than that urged by O'Neill.
Our approach is broader because we focus not just on
Cellular's application purchase agreements but upon the
entire investment scheme Cellular promoted. Thus, the
issue is not whether the agreements are securities, but
whether the scheme of which the agreements are a part
constitutes the sale or offer for sale of securities. Our
approach is more restricted than that urged by O'Neill
because we consider only investment contracts. Since we
conclude that Cellular's scheme constitutes the sale or offer
for sale of securities in the nature of investment contracts,
we need not, and so do not, inquire whether the criteria for
profit sharing agreements or risk capital are also satisfied.

■ The federal definition of an "investment contract" was
first stated in *SEC v. W.J. Howey Co., supra*. There, owners
of large tracts of citrus acreage offered to sell investors
small lots of fruit trees together with a service contract by
which the owners' affiliate would pick and market the fruit,
and the profit would inure to the investors. The Court held
that the promotional scheme was an investment contract
and hence a security. *Howey*, 328 U.S. at 299. An invest-
ment contract, the Court explained, is "a contract, transac-

tion or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party". *Howey*, at 298-99. Later decisions have refined this test, and the requirement that profits be derived "solely" from the efforts of others has been modified to one that the profits come "primarily" or "substantially" from the efforts of others. *See, e.g., SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821 (1973); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974). We apply the *Howey* test, with its subsequent modification, as the law in Washington. *Philips*, at 634-35; *McClellan*, at 532.

### 1. Investment of Money

The first prong of the *Howey* test requires an investment of money. O'Neill initially gave Cellular $5,000 to prepare and submit applications, and he agreed to pay an additional $5,000 for each of the first three licenses and $10,000 from the profits derived from each subsequent license. These payments were, or would have been once made, investments of money.

Cellular argues that an investment of money requires that the investor provide capital to finance a common business venture to be managed by the seller, and that O'Neill's initial $5,000 payment was merely a fee for the application filing service. Cellular relies on *SEC v. Energy Group of Am., Inc.*, 459 F. Supp. 1234 (S.D.N.Y. 1978), which involved a lottery system by which the Department of the Interior, Bureau of Land Management (BLM), awards leases, for a nominal annual rent, to develop oil and gas resources on certain federal lands. Energy Group of America, Inc. (EGA) was a BLM lottery application filing service that helped its customers select parcels warranting an application, filled out and submitted the customers' applications, and paid the first year's rent for those customers who won a lease. EGA also informed the successful applicant of inquiries regarding sale of the lease and stood ready to buy the lease from the applicant. The Securities and Exchange Commission (SEC)

contended that this combination of services constituted selling an unregistered security. The court disagreed, finding none of the elements of the *Howey* test satisfied. Characterizing the payment to EGA as merely a fee for services rendered, the court said that there was no investment of money because there was no capital contribution and no anticipation of any return on capital. *Energy Group of Am., Inc.,* at 1239.

Most securities administrators who have addressed the issue have concluded, contrary to *Energy Group of Am., Inc.,* that application filing services for the BLM oil and gas lease lottery involve an investment of money and qualify as investment contracts under *Howey. See, e.g., In re Federal Resources Corp.,* [1978-1981 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,476 (Nov. 8, 1978) (Alaska Department of Commerce & Economic Development, Division of Banking & Securities); *In re Amerifirst Petroleum, Inc.,* [1982-1984 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,867 (Oct. 25, 1983) (Florida Department of Banking & Finance); *In re Federal Exploration, Inc.,* [1982-1984 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,906 (Dec. 28, 1983) (Massachusetts Secretary of State, Securities Division); *In re Overthrust Mineral Corp.,* [1982-1984 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,898 (Dec. 8, 1983) (Michigan Department of Commerce, Corporation & Securities Bureau); *In re Federal Oil & Gas Corp.,* [1982-1984 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,953 (Mar. 23, 1984) (Missouri Secretary of State); *In re Resource Serv. Co.,* [1978-1981 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,570 (Aug. 29, 1980) (Minnesota Commissioner of Securities); *In re Energy Group of Am., Inc.,* [1982-1984 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,821 (Mar. 31, 1983) (Montana Securities Commissioner); *In re Overthrust Mineral Corp.,* [1982-1984 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,849 (July 25, 1983) (Wyoming Secretary of State). Indeed, in *In re Energy Group of Am., Inc., supra,* the Montana Securities Commissioner specifically found that EGA's services involved investment contract securities.

Moreover, the reasoning of the court in *Energy Group of Am., Inc.,* was criticized in *In re Overthrust Mineral Corp.,* [1982-1984 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 71,849 (July 25, 1983) (Wyoming Secretary of State). Overthrust Mineral Corporation and others provided application filing services for the BLM lottery and organized general partnerships to share in the profits derived from winning the oil and gas leases. In an administrative decision, the Wyoming Secretary of State concluded that these filing services and partnership interests were securities and, in particular, investment contracts. *In re Overthrust,* at 70,086. Applying the *Howey* test, the Secretary specifically held that the filing fees paid by Overthrust's clients qualified as investments for purposes of the investment requirement. *In re Overthrust,* at 70,089. The Secretary criticized the reasoning of the court in *Energy Group of Am., Inc.,* as begging the question, and explained that "[c]alling the payment a fee does not prevent further consideration as to whether the fee is in fact an investment." *In re Overthrust,* at 70,089.

We agree that the payment of a service fee may be an investment for purposes of satisfying the first prong of the *Howey* test. In *Jones v. International Inventors Inc. East,* 429 F. Supp. 119 (N.D. Ga. 1976), an inventor paid a fee to a company to evaluate whether his invention was salable and, if the evaluation was favorable, to market it. The court held that the agreement between the investor and the company was an investment contract for purposes of the federal securities laws. *Jones,* at 124-25. In reaching that holding, the court had no difficulty in also concluding that the fee paid by the inventor was an investment for purposes of the first prong of the *Howey* test. *Jones,* at 122. *See also Raymond Lee Org., Inc. v. Division of Secs.,* 192 Colo. 112, 115, 556 P.2d 1209 (1976) (fee paid by inventor to marketing company was "investment", but *Howey* "common enterprise" requirement not met).

In addition, we believe Cellular's customers did anticipate a return from the initial payments they gave Cellular.

Cellular's services were designed to maximize each cus-
tomer's chances of winning a license. Each individual appli-
cation cost only $50, and customers were thus encouraged
to submit multiple applications to enhance their opportu-
nity to secure a license. Cellular also arranged settlement
groups among its customers, thereby further maximizing its
customers' chances of winning. In addition, Cellular offered
to buy minority interests from those customers who won
them and to forgive the fees those customers would other-
wise owe Cellular. In its promotional literature, Cellular
emphasized the tremendous profit potential of the cellular
telephone industry and asserted that its contingent fee
structure was premised on its own expert assessment of
anticipated profits. Viewing Cellular's scheme in its entirety,
we believe Cellular's customers did anticipate a return on
their payments.

In sum, we hold that the fees O'Neill paid Cellular con-
stituted investments of money for purposes of the first
prong of the *Howey* test.

### 2. Common Enterprise

The second prong of the *Howey* test requires that the
investment be made in a "common enterprise". This require-
ment is also met here. We have previously stated that the
term "common enterprise" denotes "an interdependence of
fortunes, a dependence by one party for his profit on the
success of some other party in performing his part of the
venture." *McClellan v. Sundholm*, 89 Wn.2d 527, 532, 574
P.2d 371 (1978). Cellular investors relied on Cellular to
obtain the information necessary for the FCC applications
and to use that information to complete the applications.
Cellular arranged for its customers' participation in settle-
ment groups. Cellular also offered those investors who won
a license the assistance necessary to defend the license from
legal challenge and then to develop the cellular telephone
system. The fact that certain services were not purchased in
every instance is not dispositive. *State v. Philips*, 108 Wn.2d
627, 633, 741 P.2d 24 (1987). What is crucial is that these

services were offered and — when viewed in their entirety — present an investment scheme in which Cellular investors were dependent for their profit on the success of Cellular in performing its part of the venture.

Moreover, Cellular was itself dependent for its profits upon the success of its investors in performing their parts of the venture. Under Cellular's fee arrangement, after the third license interest had been won, the investor owed Cellular $10,000 for each subsequent license interest won, but these payments were due from the profits the investor derived from the operating cellular telephone system. Thus, if an investor failed to develop and operate the system successfully, Cellular would never receive its $10,000 contingent fees.

In addition to this interdependence between Cellular and its investors, Cellular investors were also dependent upon each other for profits. Mutuality of interest among investors is supportive of, but not necessary for, the existence of a common enterprise under the approach to the *Howey* common enterprise element we adopted in *McClellan v. Sundholm, supra* at 532. *See generally* Annot., *"Common Enterprise" Element of* Howey *Test To Determine Existence of Investment Contract Regulable as "Security" Within Meaning of Federal Securities Act of 1933 (15 USCS §§ 77a et seq.) and Securities Exchange Act of 1934 (15 USCS §§ 78a et seq.),* 90 A.L.R. Fed. 825 (1988) (explaining differing approaches to common enterprise element of *Howey*). Each investor's chance of winning an interest in a license was greatest if the investor participated in the settlement groups Cellular organized. Such participation would typically be as a minority interest holder, since under FCC regulations the person whose name was selected in the lottery for a particular market was required to maintain the majority interest. Most Cellular investors would therefore reap profits from their investment only as minority interest holders in the settlement groups. In this way, Cellular investors were dependent on the effective leadership of

either the majority interest holder in the group or his or her appointed representative.

In sum, Cellular and its investors were dependent on each other, and Cellular investors were interdependent among themselves, for their respective profits. Therefore, we conclude that there was a common enterprise here.

 Cellular argues that there was no common enterprise because, under an express provision in the application purchase agreement, Cellular's obligations were specifically limited to performing those services necessary to prepare and file the applications. We are unpersuaded. This limiting provision in the agreement does not show that Cellular's customers were not dependent upon others for their profit. At a minimum, the customers remained entirely dependent on Cellular to prepare and file the applications. In addition, most investors who won an interest in a license were dependent upon Cellular, other investors, or other third parties to develop the cellular telephone system. To effectuate the remedial purpose of The Securities Act of Washington, the underlying economic reality of the transaction must be considered, not merely the specific terms of the contract. Here, the underlying economic reality, for the reasons we have given above, was that Cellular investors were likely to be dependent upon Cellular or others for any future profit from the licenses they won in the FCC lottery.

### 3. Expectation of Profits From the Efforts of Others

 The final prong of the *Howey* test is that the efforts of the promoter or a third party "must have been the undeniably significant ones that affected the success or failure of the investments." *Philips*, at 635. In *McClellan v. Sundholm, supra*, an investor sought to recover funds he had paid to a company engaged in the business of selling bars of silver bullion. We held that the third prong of *Howey* was met because the investor relied on the company to select and purchase an appropriate grade of silver, to arrange for its shipment and delivery to him, and to obtain

the best price on resale. *McClellan*, at 533. Similarly, in *Philips*, we held that the promissory notes marketed to investors by a loan brokerage were investment contracts, and that the third prong of *Howey* was met by the promoter's obtaining information about borrowers, determining the value of the borrowers' collateral, and, in some instances, guaranteeing collection. *Philips*, at 635. The efforts of Cellular in promoting its investors' interests are no less significant to the overall profitability of the enterprise than the efforts of the promoters in *McClellan* and *Philips*. Without Cellular's successful completion of the FCC lottery applications, no investor would have any possibility of profit. Without Cellular's organization of settlement groups, each investor's chances of winning a license would have been greatly reduced. Without the technical, financial, and legal assistance of Cellular or others to investors whose applications were chosen, many would be unable to develop the cellular telephone system.

In addition, the fact that most Cellular investors pooled their interests in settlement groups is significant. The minority interest holders in such groups were entirely dependent upon the majority interest holder, or another selected by the majority holder, to develop and manage the cellular telephone system. Therefore, for all minority interest holders in settlement groups, which includes most Cellular investors, the efforts of others were the undeniably significant ones in the realization of any profits from the mutually held license.

Because of the significance of the roles played by Cellular and others in the realization of profits, we believe that Cellular investors expected profits primarily from the efforts of others. Therefore, we conclude that the third prong of the *Howey* test is met.

Cellular argues that the third prong is not met because the service of filing an FCC application was not, in itself, sufficient to produce profit and because Cellular investors were expected to play an active role in developing the cellular telephone systems. We reject this argument. A promoter's

efforts may be "undeniably significant ones" without alone being sufficient to produce profit and despite some degree of involvement on the part of the investor. *See Christgard, Inc. v. Christensen*, 29 Wn. App. 18, 627 P.2d 136 (1981) (third prong of *Howey* test met despite active participation by investor's sons in enterprise). Cellular's successful completion and submission of the FCC lottery application was a necessary condition for any profit. Moreover, even though successful submission of the application to the FCC alone was not sufficient to produce profit, we believe Cellular's performance of the full range of services offered constituted for most investors the undeniably significant contribution to the enterprise's profitability.

### 4. The Application Purchase Agreement Was a Security

In sum, Cellular's scheme involves an investment of money in a common enterprise from which Cellular's customers expect to reap profits as the result of the efforts of others. In other words, Cellular's activities constitute the sale and offer for sale of securities in the nature of an investment contract under the *Howey* test.

### C. The Position of Federal and State Regulatory Agencies

This conclusion is consistent with the views of most state and federal securities regulators. The SEC has taken the position that an investment scheme like Cellular's is a security under the federal securities laws. In 1988, the SEC pursued an enforcement action against the founder of Cellular Application Services, Inc. (CAS), a Washington, D.C., corporation formed to market FCC cellular telephone applications. *SEC v. Lovett*, Release 11771, 33-6781 (June 20, 1988). In exchange for a $5,000 fee for the first application, CAS promised investors to prepare and file their application with the FCC, to provide needed legal representation through the law firm of CAS's founder, Lovett, and to assist the successful applicant in obtaining financing and technical services in order to construct the cellular system. CAS

also represented that it would arrange settlement groups among persons agreeing to share in any license awarded. Investors who so desired could let CAS, Lovett, and Lovett's law firm take the needed entrepreneurial and managerial actions. In its complaint, the SEC asserted that Lovett was engaged in the sale of unregistered securities in violation of the Securities Act of 1933. The SEC alleged that because of the total range of services CAS offered, CAS's activities constituted the sale and offer for sale of securities in the nature of investment contracts. After the SEC filed its civil action, Lovett, without admitting or denying the allegations in the SEC complaint, consented to the entry of a final judgment of permanent injunction against future violations of the federal securities laws. In an unreported decision, the Federal District Court entered the order.

The services performed and promised by Cellular are similar to those performed and offered by CAS, and Cellular's settlement groups appear to have been equivalent in purpose and structure to those created by CAS. Moreover, considering the complete range of services Cellular offered, it was possible for Cellular investors to be as passive as were CAS investors. Because of these similarities, we infer that the SEC would take the position that Cellular, like CAS, is engaged in the sale of unregistered securities. The position of an administrative agency charged with the enforcement and promulgation of regulations under a statute is entitled to substantial weight. *See, e.g., Bennett v. Hardy,* 113 Wn.2d 912, 928, 784 P.2d 1258 (1990). Since we seek harmony between The Securities Act of Washington and federal securities law, this inference regarding the SEC's likely position on the matter before us further supports our conclusion that cellular's application purchase agreements are securities.

State securities regulators have adopted a position similar to that of the SEC. In *Arizona ex rel. Corbin v. American Nat'l Cellular, Inc.,* [1986-1987 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 72,421 (May 7, 1986) (Arizona Superior Court), the State of Arizona pursued enforcement of its

securities laws against American National Cellular, Inc. (ANC), another FCC lottery filing service. ANC's customers paid an initial application fee and then, if they won a license, paid an additional $5,000. *American Nat'l Cellular*, at 71,938. ANC did not contest the enforcement action, and a default judgment was entered. Without analysis, the court concluded that the applications ANC sold were securities in the form of investment contracts and so applied the state securities laws. *American Nat'l Cellular*, at 71,941. Thus, the State of Arizona, acting through its Attorney General and the Arizona Corporation Commission, has taken the position, like the SEC, that an FCC lottery application service like Cellular involves the sale of securities. Securities regulators in other states appear to share this view. In its "investor alert" of October 1985, the North American Securities Administrators Association (NASAA) reported that the securities administrators in several states have taken or have threatened to take enforcement action against FCC lottery application services like Cellular.

As noted above at pages 27-28, state regulators have also generally taken the position that filing services for the BLM oil and gas lease lottery involve the sale of securities. The details of the investment schemes promoted by the various BLM lottery filing services involved in these cases vary, and in some cases securities laws administrators may not regard a BLM lottery filing service as involving the sale of securities. See Incomevest Corp., SEC No-Action Letter, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 78,964 (July 21, 1972) (SEC would not take action against BLM lottery filing company offering limited services). Nonetheless, the BLM lottery cases provide a useful analogy to the present case. That the majority of regulators deem the BLM lottery filing services to involve the sale of securities provides further support to our conclusion that Cellular's scheme also involves securities.

Finally, we believe that the practices of companies, such as Cellular, that market FCC cellular telephone lottery applications raise the kinds of concerns that the securities

laws were designed to address. In its October 1985 "investor alert", NASAA characterized the sales tactics of cellular telephone lottery services as "slick" and "highpressure boiler room". NASAA also reported that the promoters for such companies represent investment in the cellular telephone industry as "the best kept secret in the investment world" and "the growth industry of the decade", and make glowing revenue projections about "the coming cellular telephone invasion". NASAA also detailed some of the pitfalls into which unwary investors might fall, and noted that some application firms were relying on questionable representations about the investment:

> [T]he massmarket cellular telephone application firms are being accused of minimizing the long odds against winning, of guaranteeing massive profits, of ignoring new federal agency rules governing the lottery, of using unsubstantiated, overly optimistic profit projections, of filing hundreds of virtually identical applications for the same license, of softpedaling the financial risks involved in operating a cellular system, and hitting hard with sales pitches playing on the possibility of selling a license for a killing to someone who actually wants to run the cellular system.

Appellant's Clerk's Papers, at 285. Thus, although there is no contention here that Cellular engaged in misrepresentation of any kind, the type of business in which Cellular is engaged is one that raises the concern that fraud or misrepresentation may be used to lure investors into making investments without being duly advised of the risks. Inasmuch as protecting investors is one of the primary purposes of The Securities Act of Washington, the existence of these concerns confirms the propriety of applying the act to Cellular's sale of FCC lottery applications.

CONCLUSION

 Cellular's activities constitute the sale and offer for sale of securities in the nature of investment contracts. The act's registration provision, RCW 21.20.140, required Cellular to register those activities as securities. Cellular failed to do so. Thus, the application purchase agreements between Cellular and its customers — being an integral

part of Cellular's activities — were made in violation of the registration provision. Under RCW 21.20.430(5), "[n]o person who has made or engaged in the performance of any contract in violation of any provision of this chapter or any rule or order hereunder . . . may base any suit on the contract." Therefore, Cellular may not base any suit on its application purchase agreement with O'Neill.

The trial court's summary judgment in favor of Cellular was based upon the specific provisions of the unenforceable application purchase agreement. Accordingly, we reverse and remand with instructions that Cellular's suit be dismissed.

DORE, C.J., UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, and SMITH, JJ., and CALLOW, J. Pro Tem., concur.