# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

LLOYD HARA, an individual,

　　　　　Appellant,

　　　v.

KUNATH, KARREN, RINNE, & ATKIN
LLC, a Washington limited liability
company,

　　　　　Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

No. 71767-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 22, 2015

APPELWICK, J. — Hara appeals the trial court's dismissal of his action to enforce a severance agreement against his former employer, KKRA. The trial court concluded that the severance agreement was illegal and, therefore, unenforceable under both state and federal law. We affirm.

## FACTS

Kunath, Karren, Rinne, & Atkin LLC (KKRA) is an investment adviser registered with the United States Securities and Exchange Commission (SEC). KKRA is subject to regulation by both the SEC and the Washington Department of Financial Institutions (DFI). KKRA has about one billion dollars under its management.

KKRA hired Lloyd Hara in 1996. The parties dispute the reason why KKRA hired Hara. Hara claims he joined KKRA after KKRA approached him about joining as a separate consulting arm of the firm. KKRA claims it wanted Hara to join the firm, because Hara knew a lot of people locally and regionally and KKRA wanted Hara's help in securing his contacts as clients.

The parties did not execute a written employment contract when Hara joined KKRA. Pursuant to an oral agreement, KKRA paid Hara a salary of about $5,000 a

month. KKRA claims the oral agreement also included compensation for commissions. Specifically, KKRA contends that the oral agreement provided that Hara would receive percentages of the accounts for any new clients he brought in—three percent for the first year, two percent for the next year, and one percent for the third year.

Ned Karren, a partner at KKRA, and Hara met with several prospective clients together. Specifically, they traveled to a Native American conference in Alaska and visited with several tribes and corporations. During their trip to Alaska, Hara introduced KKRA to the Northwest Arctic Borough (NAB). Hara had a relationship with NAB prior to joining KKRA, because he did consulting work for NAB previously. Together, Karren and Hara successfully visited with NAB and NAB became a KKRA client for investment management services. Hara also received credit for helping to secure the Muckleshoot Indian Tribe (MIT) as a client. During Hara's employment with KKRA, and while he was meeting with these prospective clients, he was not registered with the SEC or the DFI. KKRA never asked Hara to register with either agency or told Hara that he needed to do so.

After Hara had worked at KKRA for about a year, KKRA indicated that he should be spending less time doing consulting and more time introducing KKRA to potential clients. At KKRA's urging, Hara sent out form letters to contacts in his Rolodex list informing them that KKRA had an investment arm if they needed services in that area. None of these letters resulted in new clients joining KKRA.

KKRA eventually told Hara that it wanted him to focus primarily on marketing instead of consulting. Hara told KKRA that his strengths were in consulting and that he

did not want to focus on marketing. At that point, KKRA asked Hara to resign. Hara submitted a letter of resignation on September 5, 1997.

Hara and KKRA then began negotiating a "Severance Agreement." Hara consulted with an attorney during the drafting process. The parties did not fully execute the Severance Agreement until January 15, 1998. The Severance Agreement had several provisions. First, KKRA acknowledged that Hara was interested in pursuing his own consulting business, and it offered to help him with the transition process. KKRA also agreed to provide additional benefits to Hara in exchange for his promise not to pursue unemployment benefits. These additional benefits included vacation days, additional salary, start-up materials for his consulting business, medical insurance, and "a percentage commission of new investment management business at the rate he has been paid in past periods, for the quarter ending September 30, 1997."

Additionally, paragraph 5 of the Severance Agreement indicated that KKRA would pay Hara his "share of the collected management fees on those accounts listed in Exhibit 'B' at percentages originally established (3-2-1%), for as long as KKRA retains the client." There is no evidence exhibit B ever existed or that any accounts were listed in it. But, Hara testified that NAB and MIT were the only two clients he introduced to KKRA who actually joined KKRA.

Paragraph 5 of the Severance Agreement also indicated that Hara would receive three percent of the payments on NAB and MIT billings. In exchange for these payments, Hara agreed not to accept employment with a competing firm. Both parties agreed to a nondisparagement clause found in a separate paragraph of the Severance Agreement.

3

Another provision of the Severance Agreement indicated that the contract was fully integrated.

After Hara's employment ended, KKRA paid Hara three percent of the NAB and MIT receipts as provided for in paragraph 5 of the Severance Agreement. The Severance Agreement provided for these three percent payments to continue in perpetuity for as long as KKRA retained NAB and MIT as clients. This was the case even though Hara's oral employment agreement provided that the percentages Hara was paid on those accounts would drop to two percent the second year and one percent the third year had he remained employed with KKRA.[1] Copies of checks KKRA gave to Hara and the corresponding fee invoices indicate that KKRA paid Hara commissions representing three percent of the receipts for NAB and MIT during Hara's employment in 1996—the first year of his employment. The checks were labeled "Wages: Marketing: Commissions."

From 1998 through 2009, KKRA paid Hara pursuant to the terms of the Severance Agreement. The checks and the Internal Revenue Service form 1099 for the payments stated that the monetary amounts represented commissions. Hara classified the payments from KKRA as commissions on a public disclosure form.

KKRA stopped making payments to Hara in January 2010. When Hara asked KKRA why he did not receive his regular payment, KKRA attempted to pay Hara $17,000 in exchange for voiding the Severance Agreement. Hara refused the payment and sought to keep collecting on the Severance Agreement. KKRA later indicated that it would not continue to pay Hara, because he had breached the Severance Agreement by making a

---

[1] KKRA claims that Hara was in the first year of the commission schedule, receiving three percent commissions when he resigned.

4

disparaging remark about KKRA and because he was engaging in influence peddling. The parties could not reach a resolution and Hara filed a complaint for breach of contract on August 13, 2012.

KKRA originally defended against the lawsuit based on several theories including estoppel and breach of contractual duties. On October 18, 2013, Hara moved for partial summary judgment. KKRA also moved for summary judgment and defended on the basis that the Severance Agreement violated both state and federal licensing law. The trial court denied both motions.

The case proceeded to a bench trial. At trial, KKRA argued that the Severance Agreement was illegal, because it provides for the continuation of commission payments that Hara received illegally during his employment with KKRA. KKRA contended that it could not legally pay Hara the commissions under paragraph 5 of the Severance Agreement, because Hara was not registered with the DFI as an investment adviser representative and because Hara did not fall within an exemption to a federal regulation forbidding KKRA from paying him for solicitation activities. The trial court ruled orally in favor of KKRA on February 12, 2014. The trial court issued findings of fact and conclusions of law on March 11, 2014. It concluded that the Severance Agreement was unenforceable under both state and federal law. It entered judgment in favor of KKRA and dismissed Hara's claims with prejudice. Hara appeals.

DISCUSSION

Hara first contends that the trial court made two evidentiary errors at trial. Hara argues that the trial court erred when it denied his motion in limine and improperly admitted parol evidence. He then asserts that the trial court erred when it admitted

5

evidence and testimony about KKRA's payment records, because the evidence was not properly authenticated or listed on the joint statement of evidence. Hara also claims that the Severance Agreement is legal and enforceable under both federal and state law.

## I. Standard of Review

In an appeal from a bench trial, this court's review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings of fact in turn support the trial court's conclusions of law and judgment. Ridgeview Props. v. Starbuck, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the declared premise. Id. Unchallenged findings of fact are verities on appeal. Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002). We review challenges to the trial court's conclusions of law de novo.[2] Id. at 42-43.

## II. Evidentiary Challenges

Hara makes two evidentiary challenges that he contends affected the trial court's ruling.

### A. Motion in Limine - Parol Evidence

Hara contends that the trial court erred when it denied his motion in limine and improperly admitted parol evidence. In his motion in limine, Hara asked the trial court to exclude "[a]ny evidence extrinsic to the written agreement, except as it pertains to issues

---

[2] Hara contends that we should review the trial court's dismissal of his motion for summary judgment. He does so ostensibly to argue that the standard of review should be de novo. But, the trial court's order denying summary judgment is not an appealable order. Where a denial of summary judgment is based on the presence of material, disputed facts, it will not be reviewed when raised after a trial on the merits. Weiss v. Lonnquist, 173 Wn. App. 344, 354, 293 P.3d 1264 (2013).

of performance or breach of its terms." (Bold face and capitalization omitted.) The motion was broad and would have resulted in exclusion of all evidence of the type of work Hara did while employed at KKRA.

Hara contends that the trial court erred when it admitted the parol evidence, because KKRA used the evidence to show illegal intent independent of the Severance Agreement. This court reviews a denial of a motion in limine for abuse of discretion. Fenimore v. Donald M. Drake Constr. Co., 87 Wn.2d 85, 91, 549 P.2d 483 (1976).

Under the parol evidence rule:

"[P]arol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict written instruments which are contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake."

Berg v. Hudesman, 115 Wn.2d 657, 670, 801 P.2d 222 (1990) (alteration in original) (quoting St. Yves v. Mid State Bank, 111 Wn.2d 374, 377, 757 P.2d 1384 (1988)).

Evidence of Hara's oral employment agreement and the type of work Hara was doing is not parol evidence, because it was not admitted to vary or contradict a specific written term in the contract. Even assuming the evidence of Hara's oral employment agreement and activities while at KKRA constitutes parol evidence, the parol evidence rule does not exclude parol evidence to establish illegality. City of Redmond v. Kezner, 10 Wn. App. 332, 340, 517 P.2d 625 (1973). The rule forbidding the introduction of parol evidence to contradict, add to, or vary a written instrument does not extend to evidence offered to show that a contract was made in furtherance of objects forbidden by statute, by common law, or by the general policy of the law. Auve v. Fagnant, 16 Wn.2d 669,

7

677, 134 P.2d 454 (1943). Therefore, the trial court did not abuse its discretion when it denied Hara's motion in limine.

### B. Admission of Exhibit 13

Hara also claims that the trial court erred when it admitted evidence—KKRA's payment records (Exhibit 13) and Karren's testimony about Exhibit 13—to show that KKRA considered the payments it made to Hara commissions. Exhibit 13 is one of KKRA's payment records including a column listing Hara's commissions from 1996-2010. Hara contends that admission of the evidence was improper, because the evidence was not submitted by either party as a trial exhibit and it was not listed on the joint statement of evidence. He further contends that it was not properly authenticated.

At trial, on February 11, 2014, counsel for KKRA stated that he sent the payment record to Hara's counsel on November 7, 2013—the day that he received it. KKRA's counsel stated that he did not produce the document on the joint statement of evidence, because he did not know that whether Hara received commissions was going to be an issue. It was his understanding that that fact had been established. He argued that, alternatively, he could submit the exhibit to impeach Hara's testimony that he did not remember receiving commissions while working at KKRA.

Admission of evidence lies largely within the sound discretion of the trial court. Davis v. Globe Mach. Mfg. Co., 102 Wn.2d 68, 76-77, 684 P.2d 692 (1984). Absent abuse of that discretion there is no error. Id. KCLR 4(k) provides that all parties shall file a joint statement of evidence no later than five court days before the scheduled trial including a list of exhibits each party expects to offer at trial. Hara provides no authority

8

for the assertion that a trial court may not allow the admission of an exhibit not provided in the joint statement of evidence.

The trial court allowed Karren to testify about the document, reasoning that Hara's counsel had previously received a copy of the document and that it had no reason not to believe KKRA's counsel's belief that the commission issue would not be raised at trial. And, the trial court admitted Exhibit 13, reasoning that Karren was a proper custodian for authentication purposes, because he saw Exhibit 13 previously, saw the checks and invoices used to generate Exhibit 13, and is aware of how KKRA's business records are maintained.

Similarly, this court reviews a trial court's decision regarding the authenticity of an exhibit under an abuse of discretion standard. State v. Williams, 136 Wn. App. 486, 499, 150 P.3d 111 (2007). ER 901 requires the proponent of the evidence to make a prima facie showing that the evidence is authentic—it is what it purports to be. Rice v. Offshore Sys., Inc., 167 Wn. App. 77, 86, 272 P. 3d 865 (2012). Under ER 901(b)(1) authenticity may be established based on testimony of a witness with knowledge who claims that the a matter is what it is claimed to be. Karren testified that he was familiar with KKRA's business records and that he had previously seen the checks used to generate Exhibit 13. We conclude that the trial court did not abuse its discretion when it determined that Exhibit 13 was properly authenticated, when it admitted the exhibit or when it allowed Karren to testify about it.

III. Challenged Findings of Fact

Hara argues that the trial court did not have substantial evidence to support the finding of fact that Hara's original employment contract was oral. It is unclear whether

9

Hara is challenging the finding that an employment contract existed or that it was oral. But, either way, both Hara and Karren testified at trial that Hara's employment with KKRA was governed by an oral agreement. There was substantial evidence in the record to support this finding.

Hara also challenges the finding that Hara's work at KKRA included both consulting and soliciting new clients. But, there was substantial evidence in the record that Hara both consulted and worked to solicit clients. Hara testified that he was brought on to join as a separate consulting arm of KKRA. Hara testified that he billed for his consulting practice while with KKRA. Specifically, he testified that he consulted for NAB and MIT after they became KKRA clients. Regarding solicitations, Karren testified that he and Hara traveled to Alaska to solicit prospective clients. Hara testified that he sent letters to his contacts informing them that KKRA had an investment arm if they needed services in that area. Hara introduced KKRA to NAB and received credit for helping to secure MIT as a client. Hara testified that he introduced KKRA to MIT, because he had been doing consulting work for MIT. There was substantial evidence in the record to support the finding that Hara was both consulting and soliciting clients while working at KKRA.

Hara also challenges the trial court's finding of fact that he was paid both a salary and commissions while working for KKRA and that the commissions were for clients that Hara participated in procuring for KKRA. Both Hara and Karren testified that KKRA paid Hara a fixed salary. At trial, Karren testified that KKRA also paid Hara commissions starting at a three percent rate for the first year, two percent the next year, and one percent for the third year for any new client he brought into the firm. Moreover, the

Severance Agreement states that KKRA would pay Hara "a percentage commission of new investment management business at the rate he has been paid in past periods"—implying that he had previously been paid commissions for generating investment management business. Karren testified that copies of checks KKRA paid to Hara marked as "commissions" match three percent of the NAB and MIT fees for the corresponding quarter. There was substantial evidence in the record to support this finding.

Finally, Hara challenges the trial court's findings of fact that Hara successfully solicited NAB, had some involvement with obtaining MIT as a client, and solicited a number of other entities on behalf of KKRA. Hara testified that he had a relationship with NAB prior to joining KKRA, because he consulted for them. He further testified that he introduced KKRA to NAB. Karren testified that Hara received credit for helping to secure MIT as a client. Hara testified that he had a relationship with MIT prior to joining KKRA.[3] Karren testified that he and Hara solicited several prospective clients on a trip to Alaska. Hara sent out letters to several of his contacts informing them about KKRA's investment services. There was substantial evidence in the record to support this finding.

IV. Illegality

Hara claims that the trial court erred when it concluded that the Severance Agreement was illegal under both federal and state law.

---

[3] Hara emphasizes that Karren testified that someone else solicited the MIT account. But, Hara testified that he introduced KKRA and MIT. And, this court defers to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence and credibility of the witnesses. Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 861, 292 P.3d 779 (2013).

11

A. Illegality of Payments Under Federal Law

Under federal law, investment advisers[4] with more than $25 million in assets under management must register with the SEC. 15 U.S.C. §§ 80b-3(a), 80b-3a(a)(1)(A). And, 15 U.S.C. § 80b-3a(b)(1)(A) preempts most state regulation of investment advisers. Federal law restricts KKRA's ability to pay money for solicitation activities. Specifically, "[i]t shall be unlawful for any investment adviser required to be registered pursuant to section 203 of the [Investment Advisor] Act to pay a cash fee, directly or indirectly to a solicitor with respect to solicitation activities" unless an exemption applies. 17 C.F.R. 275.206(4)-3 (emphasis added). A "solicitor" is "any person who, directly or indirectly, solicits any client for, or refers any client to, an investment adviser." 17 C.F.R. 275.206(4)-3(d)(1).

KKRA is an investment adviser registered with the SEC and is thus regulated by the SEC under federal law. The trial court found that Hara solicited new clients for KKRA, and that KKRA paid Hara commissions for clients that Hara helped solicit. After Hara resigned, the Severance Agreement provided that Hara would receive compensation measured as a percentage of the on-going fees earned by KKRA in managing the NAB and MIT accounts—accounts that Hara helped solicit. Tbhe trial court concluded that it would be unlawful under federal law for KKRA to pay Hara, either directly or indirectly, with respect to solicitation activities.

Hara argues that federal law is not relevant or applicable, because no allegation was made and no inference can be drawn based on the language of the Severance

---

[4] An "investment adviser" means any person who, for compensation, engages in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. 15 U.S.C. § 80b-2.

Agreement that Hara is required to engage in solicitation or investment representative activities <u>upon signing the Severance Agreement</u>. In making this argument, Hara assumes both that the illegality can be based on only <u>his</u> actions and that the compensation provided in the Severance Agreement is not connected to the illegal compensation Hara received for his solicitation activities while he was employed with KKRA. Neither assumption is supported by legal authority. Continuation of solicitation activity after signing the Severance Agreement is not necessary to establish a violation of the federal law. It is enough that the payments are being made with respect to solicitations that were illegal when made.

Hara contends that even if the payments during his employment were with respect to solicitation activities, they were not illegal under the employee exemption in 17 C.F.R. 275.206(4)-3(a)(2)(ii). The exemption states that a cash fee can be paid to a solicitor who is an employee of the investment adviser provided that the employee's status as a solicitor of the investment adviser is disclosed to the client at the time of the solicitation or referral. <u>Id.</u> There is no evidence in the record that any such required disclosures were made to NAB or MIT. And, the trial court concluded that no evidence was introduced at trial that an exemption applied.

Because the Severance Agreement required KKRA to compensate Hara directly or indirectly with respect to solicitation activities and because there is no evidence that an exemption applies, the trial court properly concluded that the Severance Agreement was illegal under federal law.

B. Illegality of the Contract Under State Law

While federal law regulates investment advisers, state law regulates "investment adviser representatives," defined as:

> [A]ny partner, officer, director, or a person occupying similar status or performing similar functions, or other individual, who is employed by or associated with an investment adviser, and who does any of the following:
>
>     (a)    Makes any recommendations or otherwise renders advice regarding rsecurities; . . .
>
>     . . . .
>
>     (d) Solicits, offers or negotiates for the sale of or sells investment advisory services.

RCW 21.20.005(9). It is unlawful for any person to transact business as an investment adviser or investment adviser representative unless the person is registered or exempt. RCW 21.20.040(3).

Hara contends that the trial court erred when it concluded that he was an investment adviser representative while he was employed by KKRA. Consequently, he contends that the trial court erred when it concluded that the oral employment contract violated RCW 21.20.040(3), because it required KKRA to pay Hara for services as an investment adviser representative when he was not registered.

However, Hara's work with KKRA included both consulting and soliciting new clients for KKRA. The trial court correctly found that Hara was working as an investment adviser representative and that KKRA was compensating Hara for that work. Hara was not registered with the DFI. And, Hara does not challenge the trial court's conclusion of law that he does not meet the requirements for any exemption to RCW 21.20.040(3).

Therefore, the trial court properly concluded that the oral employment contract violated RCW 21.20.040(3).

Hara then claims that he was not an investment adviser representative when the Severance Agreement was executed, because he was not employed by or associated with KKRA at that time. Hara contends that the illegality of the oral employment agreement does not affect the legality of the Severance Agreement, because the Severance Agreement is only incidentally or indirectly connected to the oral employment agreement, if at all. Specifically he claims that the Severance Agreement is supported by valid, independent consideration.

In determining whether the Severance Agreement is severable from the illegal oral employment agreement, we engage in the three-part test established by the court in Sherwood & Roberts-Yakima, Inc. v. Cohan, 2 Wn. App. 703, 713-15, 469 P.2d 574 (1970). We consider (1) whether or not the Severance Agreement is separate and distinct from the antecedent illegal solicitation payments in the oral employment agreement (2) whether there is independent legal consideration to support the Severance Agreement and (3) whether the Severance Agreement provisions sued upon are sufficiently remote, collateral, or severable from the antecedent illegal solicitations so that the enforcement of the Severance Agreement does not result in sanction of the original illegal contract or conflict with the policy against enforcing illegal contracts. Id.

In Cohan, an electronics sales corporation (Lifetone) sold radios and fire alarm systems to consumers. Id. at 704-05. In exchange, the consumers would furnish Lifetone with a list of prospective purchasers. Id. at 705. For each sale Lifetone made based on a consumer's referral, the consumer would receive a $100 commission. Id. The Lifetone

salesman would assure the consumer that the commissions would be adequate to cover the purchase price. Sherwood & Roberts-Yakima, Inc. v. Leach, 67 Wn.2d 630, 632, 409 P.2d 160 (1965). Lifetone encouraged consumers to finance the original purchase price of the item through Sherwood & Roberts. Cohan, 2 Wn. App. at 705. Sherwood & Roberts then bought Lifetone's conditional sales contracts pursuant to financing requirements, which included Lifetone's warranty that the sales transactions between Lifetone and the consumer were valid, genuine, and enforceable. Id. at 705-06. The individual Lifetone promoters also personally guaranteed the accuracy of the warranties from Lifetone to Sherwood & Roberts. Id. at 706.

Shortly after the parties made these arrangements, the Supreme Court in Leach, ruled that the referral selling scheme between Lifetone and the consumers was illegal. 67 Wn.2d at 636-37. In light of the decision in Leach, the parties in Cohan stipulated that all of the contracts assigned by Lifetone to Sherwood & Roberts were unenforceable. Cohan, 2 Wn. App. at 706. Sherwood & Roberts then sued Lifetone and its promoters for breach of their agreement warranting the assigned contracts to be valid and enforceable. Id. at 704. Lifetone defended based on illegality and claimed that the warranties were unenforceable. Id. The Court of Appeals reversed the trial court and held that the warranty contracts were severable and that Sherwood & Roberts could recover on them. Id. at 717.

i. Separate and Distinct

The first part of the severability analysis is whether the two agreements are separate and distinct—whether the Severance Agreement is separate and distinct from the illegal oral employment agreement. Id. at 713. In Cohan, the court reasoned that it

16

was important that the only illegal transactions were the transactions between Lifetone and the consumers—different parties than the parties in the case before it. Id. at 713-14. In concluding that the warranty and guarantee agreements were collateral to the illegal contracts, the court stated that it was apparent that neither the assignments containing the warranties nor the personal guarantees were substantially identical to the underlying sales contracts even though the agreements were casually related to each other. Id.

By contrast, here, the parties involved in the oral employment agreement and the Severance Agreement are identical. Moreover, the Severance Agreement provides that Hara will receive commissions based on accounts that he illegally solicited while employed under the oral employment agreement with KKRA. We conclude that the two agreements are not separate and distinct.

ii.  New and Independent Consideration

The second part of the analysis requires us to determine whether the Severance Agreement is supported by independent consideration. Id. at 714. An agreement will be enforced when collaterally related to an illegal transaction, so long as there is an independent consideration or if the plaintiff does not require the aid of the illegal transaction to make out his case. Id. The trial court concluded that the consideration for the Severance Agreement flowed directly from the illegal employment relationship. It concluded that the three percent of fees Hara was to receive under paragraph 5 of the Severance Agreement was measured by income from clients Hara never should have solicited.

Hara contends that this part of the severability analysis is satisfied as long as there is some new or additional consideration. Hara argues that there was consideration

distinct from the alleged misconduct during employment and that the independent consideration does not rely on anything from his term of employment. Hara cites to the Severance Agreement's requirements that Hara not seek employment at a competing firm and that he not seek unemployment benefits. He claims that it was logical for KKRA to tie the payments to NAB and MIT, not because Hara solicited them, but because Hara had an ongoing relationships with them and they were the clients Hara could most easily persuade to leave KKRA. But, even if this were true, it does not mean that the funds he was to receive under the Severance Agreement were not tied in part to, or derived from, the illegal solicitation activities.

Moreover, the Cohan court concluded that the consideration in that case was independent, because the consideration for the assignment and the warranties received by Sherwood & Roberts consisted solely of the cash Lifetone received and was independent from and not related to the illegal promises made by Lifetone to its customers. Id. It opined that the illegal promises between Lifetone and the consumers constituted no part of the consideration for the warranties. Id. Here, by contrast, even if the consideration flowing from Hara to KKRA was a valid noncompete promise, the consideration specified in the noncompete paragraph, flowing from KKRA to Hara, was payments specifically tied to fees paid by NAB and MIT. These were the only two clients the court found Hara successfully, and illegally, solicited for KKRA while working in an investment adviser representative capacity.

Hara contends that even if the payments were tied to the illegal employment agreement, once the employment agreement ceased, the Severance Agreement could stand alone. Hara cites to McDonald v. Lund, 13 Wash. 412, 43 P. 348 (1896), for this

18

assertion. In McDonald, partners organized an illegal gambling game together. Id. at 413-14. One partner was to run the games and the others were to collect a share of the proceeds. Id. When the partnership ceased organizing the games, one partner owed the other money, representing that partner's percentage of the gambling proceeds. Id. at 414. The McDonald court concluded that because the underlying illegal contract governing running the games had been fully executed, it would enforce the contract regarding distribution of the gambling funds. Id. at 416.

Here, Hara argues that because his employment agreement had ended, the court can enforce the independent Severance Agreement. But, unlike in McDonald, the payments in the Severance Agreement were generated from funds KKRA continued to receive as a result of illegal solicitations. As such, the underlying illegality had not ended.

Therefore, we conclude that the consideration is not sufficiently independent to allow the Severance Agreement to stand alone.

iii. Sufficiently Remote

The final factor under the severability analysis is whether the oral employment agreement is sufficiently remote, or collateral, or severable from the antecedent illegal transaction such that the enforcement of the agreement sued upon does not result in sanction of the original illegal contract, or conflict with the policy against enforcing illegal contracts. Cohan, 2 Wn. App. at 714.

Hara argues that he is not seeking to enforce payment for delivering clients to KKRA, but is instead seeking to enforce payments according to the terms of the Agreement. But, the Severance Agreement provides Hara compensation with respect to client accounts that he illegally solicited while he was an employee at KKRA. Therefore,

not only does the Severance Agreement sanction the commission scheme under the original illegal oral employment contract, but it also perpetuates it by continuing to compensate Hara from client accounts that he illegally solicited.

Therefore, we conclude that the trial court did not err when it concluded that the compensation provisions in the Severance Agreement are not severable from the original illegal oral employment agreement. Hara's suit is thus barred under state law. See RCW 21.20.430(5) ("No person who has made or engaged in the performance of any contract in violation of any provision of this chapter . . . may base any suit on the contract."). Agreements in violation of state securities law are unenforceable. See Cellular Eng'g, Ltd. V. O'Neill, 118 Wn.2d 16, 19, 820 P.2d 941 (1991) (holding a contract to be unenforceable, because it was made in violation of the Securities Act of Washington's registration requirement even though one of the parties had already performed under the contract). In an action to recover on an illegal contract, this court leaves the parties where it finds them whether or not the situation is unequal as to the parties. Leach, 67 Wn.2d at 637.

On these facts, the trial court did not err when it concluded that the Severance Agreement was illegal under federal law because it required KKRA to pay Hara, directly or indirectly, for his solicitation activities while he was employed with KKRA. Similarly, the trial court did not err when it concluded that the Severance Agreement was illegal under state law because it required KKRA to pay Hara for services as an investment adviser representative when he was not registered.

## V. Attorney Fees

Hara argues that he is entitled to attorney fees incurred both at trial and on appeal, because the Severance Agreement provides for payment of attorney fees. A contract that provides for attorney fees at trial also supports such an award on appeal. Atlas Supply, Inc. v. Realm, Inc., 170 Wn. App. 234, 241, 287 P.3d 606 (2012).

Paragraph 12 of the Severance Agreement states that the prevailing party in a legal proceeding shall be entitled to reimbursement for its reasonable costs and attorney fees incurred. As Hara is not the prevailing party on appeal, he is not entitled to attorney fees either at trial or on appeal.

We affirm.

_Appelwick, J._

WE CONCUR:

_Spearman, C.J._          _Dwyer, J._