**ULTIMATE TIMING, L.L.C., a Washington limited liability company; and Arash Kia, an individual, Plaintiffs,**

v.

**David SIMMS, an individual; SA Innovations, LLC d/b/a Sai Timing & Tracking, a Michigan limited liability company, Defendants.**

Case No. C08–1632–MJP.

United States District Court,
W.D. Washington,
at Seattle.

May 27, 2010.

1196

Carter Matthew Mann, Paul Bernard George, Richard Leigh Baum, Roberts Kaplan LLP, Portland, OR, for Plaintiffs.

Cori Gordon Moore, Joseph Perry Cutler, Kaustuv Mukul Das, Laura T. Ewbank, William David Fisher, Perkins Coie, Seattle, WA, for Defendants.

## ORDER ON CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

MARSHA J. PECHMAN, District Judge.

This matter comes before the Court on cross-motions for partial summary judgment. (Dkt. Nos. 110, 115.) The Court has reviewed the motions, the responses (Dkt. Nos. 122, 127), the replies (Dkt. Nos. 134, 137), and the documents submitted in support thereof. The Court summarizes its rulings as follows:

1. Neither party is entitled to summary judgment on Plaintiffs' claim for breach of the oral joint venture agreement.

2. Neither party is entitled to summary judgment on Plaintiffs' claim for breach of the written nondisclosure agreement

3. Neither party is entitled to summary judgment on Plaintiffs' claim for misappropriation of trade secrets; however, as a matter of law, Plaintiffs had no legally protectable trade secrets after the publication of the patent applications on July 23, 2009.

4. Plaintiffs' claim for conversion is dismissed as preempted.

5. Defendants' Washington Securities Act counterclaim is dismissed be-

cause Simms's investment was not a security.

The Court's reasoning follows.

## Background

### I. *Parties*

Plaintiff Arash Kia ("Kia") has a Ph.D. in electrical engineering and has, for the last 20 years, competed in triathlons throughout the Northwest. (Kia Decl. ¶¶ 1–2.) Kia formed co-Plaintiff Ultimate Timing, LLC ("Ultimate"), a Washington limited liability company, to develop and sell race timing chips. (Baum Decl., Ex. 8.) Defendant David Simms ("Simms") is the founder and co-owner of Defendant SA Innovations ("SAI"); both Defendants are Michigan residents. (Simms Decl. ¶ 1.)

### II. *Factual Background*

During the winter of 2006–2007, Kia read about "ultra high frequency ('UHF') radio frequency identification ('RFID') technology" and set out to design a timing system based on the UHF RFID technology. (Kia Decl. ¶ 4.) Kia describes the timing system as follows:

The UHF RFID timing system that I subsequently designed uses Class 1 Gen 2 UHF tags and ground antennas. The ground antennas are placed at the start and finish line of an athletic event where they activate "tags" worn by athletes on their shoes as the athlete passes over the antenna. The activated tags, which identify a specific athlete, are then "read" by the reader and recorded by software.

(Kia Decl. ¶ 5.) Kia began testing his system, using antennas commercially available through Impinj, but discovered the antennas on the market created blind spots that yielded unacceptable read rates. (*Id.* ¶ 6.) Kia contacted ChampionChip, a race timing system manufacturer, to gauge interest in his design. (*Id.* ¶ 7; *see also*

Simms Decl. ¶ 2.) Defendant David Simms, acting on his own behalf and not ChampionChip's, responded and expressed interest in the timing system. (Kia Decl. ¶¶ 7–8; Simms Decl. ¶¶ 2–3.) The two met and, though some of the parameters of their agreement are in dispute, Simms agreed to provide at least some funding to Kia and Ultimate Timing to commercialize his timing system in exchange for a 20% ownership and profit interest in Ultimate Timing. (Kia Decl. ¶ 8; Simms Decl. ¶ 5.) The parties do not agree that Simms agreed to buy RFID timing systems and tags exclusively from Ultimate Timing. (*Compare* Kia Decl. ¶ 8 *with* Simms Decl. ¶ 6.)

Either Kia or Simms contacted Tacit Solutions, Inc. to prepare the timing system for pilot races. (Kia Decl. ¶ 9; Simms Decl. ¶ 9.) In August 2007, the timing system was pilot tested at the Falmouth road race, though they had to use commercially-available Impinj antennas as opposed to specialized antennas. (Kia Decl. ¶ 10.) The system did not achieve viable read rates, but "[e]veryone involved … agreed that with additional development and testing" the product would be viable. (*Id.*) After November 17, 2007, the date of the Philadelphia Marathon, Kia alleges Tacit's principals became less responsive to Kia's communications.

In December 2007, the timing system malfunctioned while being used as the primary timing system at the Honolulu Marathon. (Kia Decl. ¶ 13; Simms Decl. ¶ 11.) Kia, Simms, and Tacit's relationship became increasingly "strained" following the failure in Honolulu. (Kia Decl. ¶ 13.) Tacit soon demanded $200,000 for costs associated with developing the system and, Simms alleges, Kia directed Tacit to obtain payment from him. (Simms Decl. ¶ 11.) Simms states that in mid-January, Dan Howell of Tacit told him that "Tacit, not Kia, had developed and owned the timing system" and that they were going to form another company to develop and promote the system. (*Id.* ¶ 12.)

On January 31, 2008, Kia and Simms met at Kia's home in Portland, Oregon to discuss the issues between Kia and Tacit. (*Id.* ¶ 13.) Kia asked Simms if he could record the conversation and Simms agreed, thinking Kia meant typing notes rather than creating an audio recording. (Kia Decl. ¶ 14, Simms Decl. ¶ 13; Baum Decl., Ex. 64 (partial transcript).) In Kia's view, Simms "kept telling me that I should agree to give the technology ownership to Tacit and become a fifty percent partner in a new company that would sell the very same tags that my company Ultimate Timing was going to sell." (Kia Decl. ¶ 14.) Kia declined to start a new venture with Tacit and the parties' relationship deteriorated further. (Simms Decl. ¶ 14.) Simms soon agreed to promote a "ChronoTrack Timing System" with Tacit, in exchange for a state in the new company. (*Id.* ¶ 14; Baum Decl., Ex. 69 (ChronoTrack entity report).)

Plaintiffs allege Simms and Tacit's ChronoTrack system is Kia's timing system. Simms and Tacit used the timing system at the Los Angeles marathon on March 2, 2008. (Baum Decl., Ex. 67 (article entitled "SAI Timing Performs in LA: Timing System Comes Back Strong After Honolulu Marathon Debacle").) Kia states he has received no profits from sales of the ChronoTrack system. (Kia Decl. ¶ 16.)

### III. *Summary of Claims*

Plaintiffs advance the following causes of action: (1) breach of the oral joint venture agreement by Simms (Compl. ¶¶ 38–41); (2) breach of the written non-disclosure agreement by Simms (*id.* ¶¶ 42–45); (3) breach of fiduciary duty by Simms (*id.* ¶¶ 46–49); (4) misappropriation of trade secrets in violation of RCW 19.108 by Simms and SAI (*id.* ¶¶ 50–57); (5) conver-

sion (*id.* ¶¶ 58–61); (6) unjust enrichment (*id.* ¶¶ 62–64); (7) accounting (*id.* ¶¶ 65–67); (8) knowingly providing substantial assistance in misappropriation in violation of Restatement § 876(b) (*id.* ¶¶ 68–71); and (9) acting in concert to misappropriate in violation of Restatement § 876(a) (*id.* ¶¶ 72–75).

Defendants filed the following Counterclaims: (1) breach of contract (Counterclaim ¶¶ 35–38); (2) breach of duty of good faith and fair dealing (*id.* ¶¶ 39–42); (3) unjust enrichment (*id.* ¶¶ 43–45); (4) conversion (*id.* ¶¶ 46–48); (5) accounting (¶¶ 49–51); (6) misrepresentation/fraud (*id.* ¶¶ 52–58); (7) violation of Washington's Securities Act, RCW 21.20, et seq. (*id.* ¶¶ 59–67); (8) declaratory judgment regarding the oral joint venture (*id.* ¶¶ 68–70); (9) declaratory judgment regarding the non-disclosure agreement (*id.* ¶¶ 71–73); (10) declaratory judgment regarding Simms's fiduciary duty (*id.* ¶¶ 74–76); and (11) declaratory judgment regarding the trade secrets (*id.* ¶¶ 77–79).

Plaintiffs move for summary judgment on their first (breach of oral joint venture agreement), second (breach of written contract), fourth (misappropriation of trade secrets) and fifth (conversion) claims. Plaintiffs also move for summary judgment on Defendants' seventh counterclaim for violation of the Washington Securities Act. (Dkt. No. 110 at 1.) Defendants move for summary judgment on Plaintiffs' first (breach of joint venture), second (breach of written contract), and fourth (misappropriation of trade secrets) claims and move to limit scope of Plaintiffs' damages. (Dkt. No. 115 at 4.)

## Discussion

### I. *Standard*

"Summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nor is summary judgment warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

### II. *Breach of Oral Joint Venture Agreement*

Both parties move for summary judgment on Plaintiffs' claim for breach of the alleged oral joint venture agreement ("JVA"). (Dkt. No. 110 at 11; Dkt. No. 115 at 24.) The Court first addresses Plaintiffs' motion on the merits of the JVA claim and then Defendants' motion seeking to limit damages on the JVA claim.

#### a. Breach of the JVA

"The essential elements of a contract are the subject matter of the contract, the parties, the promise, the terms and conditions, and (in some jurisdictions) the price or consideration." *DePhillips v. Zolt*

*Const. Co.,* 136 Wash.2d 26, 31, 959 P.2d 1104 (1998) (quotations omitted); *see also Paulson v. Pierce County,* 99 Wash.2d 645, 654, 664 P.2d 1202 (1983) ("The essential elements of a joint venture are (1) a contract, express or implied; (2) a common purpose; (3) a community of interest; (4) an equal right to a voice, accompanied by an equal right to control."). Because oral contracts are "often, by their very nature, dependent upon an understanding of the surrounding circumstances, the intent of the parties, and the credibility of witnesses," summary judgment is frequently inappropriate in claims for breach. *Garbell v. Tall's Travel Shop,* 17 Wash.App. 352, 353, 563 P.2d 211 (1977).

Plaintiffs' describe the exchange as follows: "Simms agreed to fund the development of Kia's timing system, to market the timing system to his fellow timers, to purchase timing systems and tags only from Ultimate Timing and to give Kia fifty percent of SAI's timing revenues, in exchange for Simms' receiving twenty percent of the profits of Ultimate...." (Dkt. No. 110 at 11–12; Kia Decl. ¶ 8.) On the record before the Court, summary judgment is inappropriate on this claim.

First, Plaintiffs have not met their initial burden of presenting unambiguous evidence on every element of their claim. Plaintiffs rely primarily on their own understanding of the joint venture when presenting evidence of the existence of the agreement. (*See* Baum Decl., Ex. 1 (Kia Dep.) at 298:20–299:09; Ex. 3 (UT Dep.) 96:22–97:23, 107:12–23; Kia Decl. ¶ 8.) Plaintiffs further rely on a statement Simms made at a deposition, but the statement is ambiguous. When asked, in essence, whether the joint venture contemplated Simms providing the capital while Kia provided the innovation, Simms responded: "Yes, that's what we were discussing." (Baum Decl., Ex. 4 (Simms Dep.) at 299:22–300:06.) Reading the evidence in the light most favorable to the non-movant, this statement does not demonstrate a meeting of the minds. (Dkt. No. 127 at 11.)

Second, there are material disputes of fact regarding the terms and conditions of the JVA. The parties dispute Simms' obligation to fund the development of the new timing system. (*Compare* Supp. Baum Decl., Ex. 6 (Kia Dep.) at 298:20–299:09 (Kia stating Simms agreed to fund the development) *with* Simms Decl. ¶ 5 (Simms stating his funding would be limited to $300,000).) Kia and Simms disagree about the extent of Simms' marketing obligations. (*Compare* Supp. Baum Decl., Ex. 6 (Kia Dep.) at 304:12–18 (Simms agreed to market to race directors and timers) *with* Simms Decl. ¶ 5 (no specific marketing obligations).) They also dispute Simms' obligation to purchase timing systems and tags exclusively from Ultimate Timing. (*Compare* Kia Decl. ¶ 8 *with* Simms Decl. ¶ 6.) These disputes of fact are material given Plaintiffs' formulation of the breach. (*See* Dkt. No. 134 at 3.) Specifically, Plaintiffs allege Simms breached when he joined forces with Tacit and then promoted the new timing system on Tacit's behalf. (*Id.* at 3–4; Baum Decl., Exs. 65–66 (Simms–Tacit discussions) and 66–67 (ChronoTrack marketing).) If, as Simms asserts, he had no specific marketing obligations to Ultimate, he may not be in breach by promoting ChronoTrack. This dispute is particularly material when the alleged JVA had no specific end date. (Fisher Decl., Ex. 20 (Kia Dep.) at 305:23–306:07.) The question of whether Simms breached turns on the terms of the underlying agreement.

Plaintiffs are not entitled to summary judgment on their claim for breach of the JVA.

#### b. JVA Damages

■ Defendants argue that Plaintiffs' damages on the JVA claim are limited as a matter of law by Kia's termination of the agreement on April 25, 2008. (Dkt. No. 115 at 24.) Defendants cite *Ford v. Trendwest Resorts, Inc.* for the proposition that, where contracts are unilaterally terminable, parties are only entitled to damages up to termination. 146 Wash.2d 146, 157, 43 P.3d 1223 (2002). *Ford* is inapplicable to the matter at hand because that court held "lost earnings cannot measure damages for the breach of an employment at-will contract because the parties to such a contract do not bargain for future earnings." *Id.* In contrast, the parties here may have bargained for future earnings in the form of ownership stakes in various entities. Even if the Court were to accept *Ford's* applicability in this context, the terms of the demand letter do not address a termination of the parties' relationship. (*See* Fisher Decl., Ex. 11 ("Mr. Kia has elected not to file immediate legal action and instead has elected to give you the opportunity to abide by the terms of your agreements.").)

■ Defendants further assert that Kia cannot recoup lost profits beyond the April 25, 2008 letter because they would be too speculative. When a performance contract does not contain a term of duration, courts construe it as "terminable-at-will by either party after a reasonable time." *Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.,* 135 Wash.App. 760, 766, 145 P.3d 1253 (2006). "Whether notice is reasonable depends on the facts and circumstances of each case" and is generally an issue for the jury. *Id.* at 766–67, 145 P.3d 1253. Further, under "new business rule," lost profits are permissible damages under a claim for breach when "a reasonable estimation of damages can be made based on an analysis of the profits of identical or similar businesses operating under substantial-ly the same market conditions." *No Ka Oi Corp. v. National 60 Minute Tune, Inc.,* 71 Wash.App. 844, 849, 863 P.2d 79 (1993). Defendants simply overstate the reach of the "new business" limitation for the recovery of lost profits. *No Ka Oi* does not preclude lost profits damages for new businesses entirely, it merely analyzes the type of evidence that a party must put forth in order to pursue the damages. The Court has not been asked to test the reasonableness of Plaintiffs' damage estimate.

Defendants are not entitled to summary judgment limited JVA damages.

### III. Breach of Written Nondisclosure Agreement

Plaintiffs and Defendants move for summary judgment on Plaintiffs' claim for breach of the written non-disclosure agreement ("NDA"). (Dkt. No. 110 at 16; Dkt. No. 115 at 20.) The Court first addresses whether either party is entitled to summary judgment on the issue of the validity of the NDA, then turns to the issue of breach.

#### a. Length of Offer

■ Defendants seek to dismiss Plaintiffs' NDA claim on the basis that Kia did not sign the NDA until the parties' relationship had ended. Unless an offer to form a contract states how long it is open, it is only open for a reasonable time. *Sherrod ex rel. Cantone v. Kidd,* 138 Wash.App. 73, 75–76, 155 P.3d 976 (2007) (citing Restatement (Second) Contracts § 41). Though reasonableness is generally a question of fact, the Court can decide the "limits of a reasonable time" if the facts are undisputed that the acceptance arose occurred after the purpose of the contract could no longer be attained. *Id.* at 76, 155 P.3d 976.

The NDA provides that "[t]he term of this Agreement shall commence on the date that this Agreement is signed by both

Parties and shall terminate five years after the last date on which any Confidential Information is disclosed under this Agreement." (Fisher Decl., Ex. 9 ¶ 5.) Simms signed the NDA on June 17, 2007 and filled out the portion at the top of the contract with his information. (*Id.*) The copy submitted by Kia as a "true and correct" version of the NDA with the Complaint does not contain Kia's signature. (Compl. ¶ 21, Ex. A.) During discovery, Plaintiffs produced a copy of the NDA with Kia's signature, dated February 16, 2008.[1] (Fisher Decl., Ex. 10.)

Plaintiffs assert that Simms waived Kia's signature requirement by receiving "confidential information" within the ambit of the contract. This is at odds with Kia's own understanding that the agreement would commence when both parties signed it. (Fisher Decl., Ex. 20 (Kia Dep.) at 273:06–274:02.) The record does not support the assertion Simms waived the signature requirement.

 Defendants ask the Court to rule that the contract is ineffective because Kia signed it after the purpose of the contract had been frustrated. By February 16, 2008, the joint venture was in peril. (*Id.* at 266:21–22 ("By then it was obvious that Mr. Simms was not going to fulfill his obligations to the joint venture . . .").) While the deterioration of the parties' relationship may impede some purposes of the NDA, there other reasons may have existed to execute the contract. For instance, the contract includes a term limiting Simms' ability to pursue "the development, sale, or purchase of an athletic timing system based on Class 1 Gen 2 RFID tags" without Ultimate Timing's consent. (Fisher Decl., Ex. 9 ¶ 10.) Thus, there are issues of fact as to whether Kia signed the

contact within a reasonable amount of time and Defendants' motion on this issue is denied.

b. Accuracy of Feb. 16, 2008 Signature

Defendants also question whether Kia actually signed the NDA on February 16, 2008; these questions preclude summary judgment in Plaintiffs' favor. (Dkt. No. 127 at 15–16.) Kia's April 2008 cease and desist letter does not mention the fact that Kia signed the NDA in February 2008. (Fisher Decl., Ex. 11.) The copy of the NDA originally provided to Simms' counsel did not include Kia's signature. Plaintiffs also did not provide the signed NDA in response to a document request for the NDA referenced in the Complaint. (Supp. Fisher Decl., Ex. D (RFP # 31).) When Mr. Wright referenced the signed NDA during a deposition, he began by asking Mr. Fisher for a "copy of the fully signed and executed NDA that was provided to him." (Supp. Fisher Decl., Ex. E (Rahimi Dep.) at (316:24–317:03.) Fisher told Wright he did not have a copy and asked Mr. Wright if he had one, and then Wright conceded he had a signed copy of the agreement. Mr. Fisher asked why it wasn't produced. Mr. Wright first responded "Because it wasn't asked for." (*Id.* at 318:02).) When Mr. Fisher asked "What do you mean, it wasn't asked for?," Mr. Wright responded, "I'm not withholding a copy of an agreement. It's come to my attention in the last 24 hours, that it was signed and sent to your client on February 16th of 2008." (*Id.*)

Defendants thus question the veracity of Kia's assertion he signed the contract on February 16. (Dkt. No. 127 at 16.) The circumstances surrounding the disclosure

---

1. Plaintiffs suggest that the date on the top of the agreement controls because the contract provides "the Parties have executed this Agreement on the date first written above," which is June 17, 2007. (Dkt. No. 122 at 19.) This argument ignores the fact that the Agreement was not executed without Kia's signature.

of the NDA create a dispute of fact regarding the validity of the NDA. The jury will have to evaluate Kia's credibility in his representations regarding signing the NDA. Plaintiffs are therefore not entitled to summary judgment on their NDA claim because material issues of fact exist regarding the effectiveness of the contract.

### c. Breach of the NDA

Defendants move for summary judgment claiming Simms did not disclose any confidential information in violation of the NDA. Disclosure is not, however, the only possible method of breach. The NDA, if effective, prohibited Simms from (1) disclosing confidential information and (2) developing or purchasing an athletic timing system based on Class 1 Gen 2 RFID tags. (Fisher Decl., Ex. 9 ¶¶ 2, 10.)

Plaintiffs assert Defendants violated the NDA by promoting and marketing the "ChronoTrack Timing System" and by using the ChronoTrack system in his own races. (Dkt. No. 110 at 17.) Tacit engaged Simms to market a system that cured the defects that arose in Honolulu and that Simms has a 22 percent ownership in ChronoTrack. (Baum Decl., Ex. 5 (Howell Dep.) at 121:05–11 (Tacit and Simms discuss forming a new company to promote the ChronoTrack system).) Simms disputes the alleged breach of the NDA, claiming he did not develop or directly sell ChronoTrack, but this is a dispute of fact that must be settled by a jury. (Simms Decl. ¶ 14.) Material issues of fact preclude summary judgment in Defendants' favor on Plaintiffs' claim for breach of the NDA.

### d. NDA's Purported Non-compete Provision

Finally, Defendants seek dismissal of the NDA claim arguing the contract is a covenant not to compete that is invalid as a matter of law. (Dkt. No. 127 at 18.) Defendants rely on caselaw analyzing non-compete covenants in employment contracts. (*See id.*) (citing *Wood v. May,* 73 Wash.2d 307, 438 P.2d 587 (1968) (horseshoe employee).) The NDA is, however, not an employment contract. It contemplates a much more complex role for Simms and Simmco Data Systems: "Simmco Data Systems and its associates operating as investors, partner companies, value added resellers, and race directors agree to exclusive purchase athletic event systems based on Class 1 Gen 2 RFID tags from Ultimate Timing ...." (Baum Decl., Ex. 24 ¶ 10.) Because the NDA is not an employment contract, the Court declines to dismiss the NDA claim based on Defendants' non-compete clause arguments.

Material issues of fact preclude summary judgment as to either the effectiveness of the NDA or the existence of a breach.

## IV. *Misappropriation of Trade Secrets*

■ Plaintiffs and Defendants move for summary judgment on Plaintiffs' fourth claim for misappropriation of trade secrets. Washington's Uniform Trade Secrets Act, RCW 19.108.030(1), provides a "complainant may recover damages for the actual loss caused by misappropriation" of trade secrets. The statute defines "misappropriation" as:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was (A) derived from or through a person who had utilized improper means to ac-

quire it, (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

RCW 19.108.010(2). Plaintiffs asserting a trade secrets claim bear the burden of proving "that legally protectable secrets exist." *Boeing Co. v. Sierracin Corp.*, 108 Wash.2d 38, 50, 738 P.2d 665 (1987). The Court must consider (1) whether there is an identifiable trade secret at issue that is not readily ascertainable; (2) whether Plaintiffs made reasonable attempts to preserve the trade secret; and (3) whether Defendants misappropriated or used the trade secret.

### a. Trade Secret

Washington's UTSA defines "trade secret" as:

> ... information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.18.010(4); *see also Boeing*, 108 Wash.2d at 49–50, 738 P.2d 665. Trade secrets "frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets." *Boeing*, 108 Wash.2d at 50, 738 P.2d 665; *see also Machen, Inc. v. Aircraft Design,*

*Inc.*, 65 Wash.App. 319, 327, 828 P.2d 73 (1992) (considering multiple elements together as one concept) *overruled on other grounds by Waterjet Technology, Inc. v. Flow Intern. Corp.*, 140 Wash.2d 313, 996 P.2d 598 (2000).

During discovery, the Court granted Defendants' motion to compel and directed Plaintiffs "provide specific and complete answers to Defendants Interrogatory Nos. 8, 13, 14, and 15, including without limitation identifying with specificity the trade secrets and confidential information that Plaintiffs allege Defendants misappropriated." (Dkt. No. 71; *see also* Fisher Decl., Ex. 12 (response upon Court's Order).) Defendants summarize the response as including the following elements: (1) using Class 1 Gen 2 UHF tags for RFID system; (2) encoding bib numbers into tag memory; (3) encoding tags such that the first 10 digits of the 96–bit EPC code in the tags were the same as the bib numbers, with the remaining digits made into trailing zeros; (4) attaching tags on bibs with mild adhesive, which could then be peeled off and attached to runners' shoes; (5) ground field antenna that radiates in a pattern that concentrates field in runners' path of travel; and (6) Determination that it was necessary to use two antenna lines in close proximity to reach industry-acceptable read rates. (Dkt. No. 115 at 11.) Plaintiffs summarize the trade secret as a "unique combination of UHF Class 1 Gen 2 RFID tags, with proper reader and antenna specifications, configurations, and software code, all housed in a portable, waterproof battery-operated controller box." (Dkt. No. 110 at 18; *see also* Dkt. No. 122 at 4–5 ("Kia's particular recipe of specialized features within custom antennas, readers, encoded read/writable tags, and overall process that establish the uniqueness of Kia's timing system.").)

■ Neither party is entitled to summary judgment on the issue of the existence of a trade secret because there are material disputes about whether the timing system was readily ascertainable. On one hand, Plaintiffs cite to Simms' statement that, in the fall of 2007, there was no other timing system like Kia's system. (Baum Decl., Ex. 4 (Simms Dep.) at 184:25–185:09.) They further reference statements from other individuals in the industry extolling the virtues of certain elements of the timing system. (*See, e.g.,* Baum Decl., Ex. 2 (Magnusson Dep.) at 39:03–40:09.) This may be some evidence that the timing system derives an independent economic value and not generally known. On the other hand, Defendants have submitted evidence that a number of elements that drive the value of the timing system were generally known or ascertainable. (*See* Fisher Decl., Ex. 22 (Hansen/ITS Dep.) at 38:17–39:05 (DAG system using disposable encoded tags with bib numbers on bibs); Ex. 23 (Lockwood/Ipico Dep.) at 38:12–42:13 (RFID tags removed from bibs and attached to shoes).) The statements of those individuals extolling the purported novelty of the Kia systems are in tension with those statements describing the commonplace nature of the technology. A trier of fact must therefore determine whether Kia's system possessed independent economic value and was not readily ascertainable.

### b. Reasonable efforts/Disclosure to others

To preserve trade secret protection, an owner must make reasonable efforts under the circumstances to maintain secrecy. RCW 19.18.010(4). Whether an owner's precautions are reasonable is generally a question of fact. *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.,* 925 F.2d 174, 179 (7th Cir.1991) ("... only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment, because the answer depends on a balancing of costs and benefits that will vary from case to case and so require estimation and measurement by persons knowledgeable in the particular field of endeavor involved."). Defendants argue Plaintiffs have failed to take reasonable efforts to maintain secrecy because (1) they disclosed the idea to others while developing the product and (2) they disclosed the idea in the patent application.

### i. Disclosure to Others

■ Defendants describe, in great detail, the disclosures made to others that weigh against the existence of a protectable trade secret. (Dkt. No. 115 at 11–13.) These disclosures do not, however, entitle Defendants to summary judgment.

First, Defendants do not point any disclosures of the whole timing system. (*See* Dkt. No. 137.) Nor do Plaintiffs cite any disclosure of the sixth element of Kia's purported secret: the use of two antenna lines in close proximity. (*See* Dkt. No. 115 at 13.) This is critical, since elements of a trade secret protection can arise over an aggregation of ideas. *See Boeing,* 108 Wash.2d at 50, 738 P.2d 665. Second, there are material issues of fact concerning Plaintiffs' attempts to preserve the confidentiality of the information he did provide. For instance, Kia states that, although he did not have a signed NDA with Winning Time, he did email them a request to keep the presentation confidential. (Supp. Baum Decl., Ex. 86 (Kia Dep.) at 274.) Whether these efforts were reasonable is a question of fact that would be improper for this Court to decide on summary judgment. *See Rockwell Graphic Systems,* 925 F.2d at 179.

Thus, there are issues of fact as to whether Kia's efforts to maintain secrecy were reasonable.

### ii. Patent Application

■ Plaintiffs are not entitled to trade secret protection for the time period after the timing system was disclosed when Kia's patent applications were published. "Matter which prior to a patent grant might have been subject to protection as a trade secret is deemed disclosed to the extent that it is described in the patent." 1 Roger M. Milgrim & Eric E. Bensen, *Milgrim on Trade Secrets* § 1.06[1] (collecting cases); *see also BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 707 (7th Cir.2006) ("Publication in patent destroys the trade secret ... because patents are intended to be widely disclosed-that is the quid for the quo of the patentee's exclusive right to make and sell the patented device."). Defendants argue Kia's trade secrets, to the extent they exist, were extinguished upon publication of the patent applications. Kia concedes his trade secrets are disclosed in the patent applications. (Fisher Decl., Ex. 20 (Kia Dep.) at 321:09–322:11.) The patent applications were published on December 25, 2008 and July 23, 2009. (Fisher Decl., Exs. 17–18.) Thus, Plaintiffs have no protectable trade secrets after July 23, 2009.

■ The publication of the patents does not, as Defendants' suggest, limit Plaintiffs' potential damages to those suffered before July 23, 2009. If they prevail on their claim, Plaintiffs may be entitled to relief for an unfair "head start" Defendants gained through the misappropriation. *See, e.g., Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991) (head start discussed in the context of injunctive relief). Defendants' motion does not ask the Court to conclusively determine the length of a potential head start period.

### c. Misappropriation

■ To prevail on a claim for misappropriation of trade secrets, a plaintiff must also demonstrate disclosure or use of the purported secret. RCW 19.108.010(2). Here, too, material issues of fact preclude summary judgment. During their conversation on January 31, 2008, Simms suggests any timing system developed by Tacit would involve Kia's ideas:

> Kia: [Tacit's] not a timing company. They're an RFID engineering company. We give them credit for that and we respect that and let them-let their name get out there that anyone wants to develop an RFID based system, it's them. The concept of timing using this particular tact—
>
> Simms: It came from you and UT.
>
> Kia: And that's all we want. We're not saying anything· else. They're taking .credit for that. The system that gets developed should not have their brand name on it. . . .

(Baum Decl., Ex. 64 at 90:17–91:08.) Simms' testimony suggests some portion of the ChronoTrack system derives from Kia's technology:

> Q: You are currently working with and subject to an agreement whereby you will become a part owner of Chrono-Track, which ... Tacit ... formed, based upon the technology that you and Mr. Kia co-developed and worked on throughout the Fall of 2007. You have decided to join them rather than stay with Mr. Kia?
>
> A [Simms]: That is correct.

(Baum Decl., Ex. 7 (SAI Dep.) at 325:22–326:03.) In contrast, Tacit insists they owned the timing system and, thus, there could be no misappropriation. (Supp. Fisher Decl., Ex. K (Howell Dep.) at 57:03–58:05.) There are issues of fact as to whether Simms used Kia's trade secret in pursuit of the ChronoTrack. The Court cannot decide the issue of disclosure or use as a matter of law.

In sum, material issues of fact pervade Plaintiffs' claim for misappropriation of trade secrets and neither party is entitled to summary judgment on the issue.

### V. *Conversion*

 Conversion is "the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived the possession of it." *Westview Investments, Inc. v. U.S. Bank Nat. Ass'n*, 133 Wash.App. 835, 852, 138 P.3d 638 (2006) (quotations omitted). Defendants insist the conversion claim is preempted by the WUTSA. The Act provides that it "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of trade secret." RCW 19.108.900(1); *see also* RCW 19.108.900(2)(a) (noting the displacement does not affect civil liability that is not based on trade secret misappropriation).

 "A plaintiff may not rely on acts that constitute trade secret misappropriation to support other causes of action." *Thola v. Henschell*, 140 Wash.App. 70, 82, 164 P.3d 524 (2007) (quotations omitted). To determine whether the UTSA preempts a common law claim, the court must "(1) assess the facts that support the plaintiff's civil claim; (2) ask whether those facts are the same as those that support the plaintiff's UTSA claim; and (3) hold that the UTSA preempts liability on the civil claim unless the common law claim is factually independent from the UTSA claim." *Id.* Plaintiffs concede their conversion claim is simply an alternative to their misappropriation claim. (Dkt. No. 134 at 8–9.) In their motion, Plaintiffs identify both the "chattel" at issue and the "trade secret" as the totality of Kia's timing system. (Dkt. No. 110 at 27; *see also* Compl. ¶ 59 ("Simms's actions as set forth above constitute conversion of proprietary information and trade secrets provided to Simms by Kia.").) Pursuant to *Thola*, this court find the conversion claim is preempted because it is not factually independent of the WUTSA claim. 140 Wash.App. at 82, 164 P.3d 524. Plaintiffs' claim for conversion fails as a matter of law.

### VI. *Washington Securities Act*

 Finally, Plaintiffs are entitled to summary judgment on Defendants' securities claim. RCW 21.20.005(12)(a) defines the term "security" as including:

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; investment of money or other consideration in the risk capital of a venture with the expectation of some valuable benefit to the investor where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture . . .

Washington courts apply a modified *Howey* test and define a security as "(1) an investment of money (2) in a common enterprise and (3) the efforts of the promoter or a third party must have been fundamentally significant ones that affected the investment's success or failure." *Ito Int'l Corp. v. Prescott, Inc.*, 83 Wash.App. 282, 291, 921 P.2d 566 (1996) (citing *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)); *see also Cellular Engineering, Ltd. v. O'Neill*, 118 Wash.2d 16, 25–26, 820 P.2d 941 (1991). Though limited partnership interests are generally considered securities, the protections only apply when there is passive investment. *State v. Argo*, 81 Wash.App. 552, 564–65, 915 P.2d 1103 (1996) (citations omitted). Where parties have negotiated the investment at issue (instead of merely

negotiating the quantity of money exchanged), Washington courts have found "investors do not need the protections of the securities laws." *Id.* at 565, 915 P.2d 1103.

Defendants insist the claim should not be dismissed because Simms' capital contribution was either (1) an investment contract or (2) a risk capital investment. (Dkt. No. 127 at 30.) Neither argument is persuasive. The third prong of the *Howey* test, which analyzes whether investment contracts are securities, looks to whether the profits on an enterprise "come primarily or substantially from the efforts of others." *Cellular Engineering*, 118 Wash.2d at 26, 820 P.2d 941. Likewise, a risk capital investment may arise "where the investor does not receive the right to exercise practical and actual control over the managerial decisions of the venture." RCW 21.20.005(12)(a). Here, Simms's own description of the investment precludes a finding that the investment was a security. Simms explains he "agreed to provide limited funding to Kia and Ultimate Timing to commercialize the system and to help market the timing system in exchange for a 20% ownership and profit interest in Ultimate Timing." (Simms Decl. ¶ 5.) He concedes he made efforts to ensure the success of the enterprise: "I spent substantial time and effort marketing the timing system to race directors and race timers during the time I was working with Kia and Ultimate Timing." (*Id.* ¶ 8.) Simms negotiated with Tacit on Ultimate Timing's behalf. (Baum Decl., Ex. 4 (Simms Dep.) at 222:02–223:05.) Thus, Simms' own statements indicate he had actual control over certain managerial decisions and made substantial efforts to ensure the venture became profitable. Simms' contribution, which he agreed to provide at the conclusion of face to face negotiations, was not the type of passive investment that falls within the ambit of a security.

Plaintiffs are entitled to summary judgment on Defendants' claim for violation of Washington's Securities Act and the claim is dismissed.

## VII. *Other Damages*

Defendants' motion also asks the Court to rule Plaintiffs are not entitled to recover damages on behalf of Event Buddy, Green-Layer, and Final Timing because the action is not brought on their behalf. (Dkt. No. 115 at 27.) Plaintiffs agree that Kia and Ultimate Timing "each only seek to recover their own respective damages" and not those of the non-parties. (Dkt. No. 122 at 26.) Defendants also argue Kia is not entitled to recover damages due to Ultimate Timing. (Dkt. No. 115 at 28–29.) Kia recognizes this statement "is both self-evident and irrelevant" because "Ultimate Timing is aloes a plaintiff and damages are sought by each of them." (Dkt. No. 122 at 26–27.)

Defendants abandon both these argument in their reply and the issues do not appear to be in dispute. (*See* Dkt. No. 137 at 9–14.)

## VIII. *Sealed Record*

In its previous rulings sealing certain documents submitted in support of these underlying motions, the Court indicated it may revisit the issue of sealing once it ruled on the cross-motions for partial summary judgment. (*See* Dkt. No. 151 at 3.) Because the Court has now found the publication of Plaintiffs' patent applications preclude trade secret protection after July 23, 2009, the rationale for preserving the documents under seal no longer exists. Unless Plaintiffs file a renewed motion to seal, within seven days of this Order, the Court shall unseal the remainder of the record.

## Conclusion

Material issues of fact preclude summary judgment on a number of claims.

Neither party is entitled to summary judgment on (1) Plaintiffs' claim for breach of the oral joint venture agreement, (2) Plaintiffs' claim for breach of the written non-disclosure agreement, or (3) Plaintiffs' claim for misappropriation of trade secrets. The Court does find that, as a matter of law, Plaintiffs forfeited their trade secrets protection after the publication of Kia's patent application on July 23, 2009. Plaintiffs' claim for conversion fails as a matter of law because the WUTSA displaces the common law tort based on the same factual allegations. Defendants' securities counterclaim is dismissed because the investment at issue is not a security. Both cross-motions are therefore DENIED IN PART and GRANTED IN PART. If Defendants wish to preserve any part of the record under seal, they must file a motion to seal within seven (7) days of this Order. The Clerk shall transmit copies of this Order to all counsel of record.